[No. 2061.]

GEORGE WITTE v. THE STATE.

THEFT OF FILED PAPERS—INDICTMENT.—Article 741 of the Penal Code pro-
vides that, "if any person shall take and carry away any record book
or filed paper from any clerk's office, public office, or other place where
the same may be lawfully deposited, or from the lawful possession of any
person whatsoever, with intent to destroy, suppress, alter or conceal, or
in any wise dispose of the same, so as to prevent the lawful use of such
record book or filed paper, he shall be deemed guilty of theft and pun-
ished by imprisonment in the penitentiary not less than three nor more
than seven years." See the opinion and the statement of the case for evi-
dence under which, in order to support a conviction for the theft of a deed
to land, the indictment should have alleged the particular lawful use of
the paper sought to be prevented by the accused by stealing it. See the
opinion on the whole question.

APPEAL from the District Court of Bexar. Tried below be-
fore the Hon. G. H. Noonan.

A term of three years in the penitentiary was the penalty as-
sessed against the appellant upon his conviction, under an in-
dictment, the charging part of which reads as follows:
"* * * * that George Witte, on the fourth day of the
month of June, in the year of our Lord, one thousand eight hun-
dred and eighty five, in said county of Bexar and State of Texas,
did then and there fraudulently and feloniously steal, take and
carry away a filed paper from the office of the county clerk of
Bexar county, Texas; that is to say, a certain paper filed and law-
fully deposited for record in the office of said county clerk on the
third day of June, A. D. 1885, at ten and one quarter o'clock in
the morning of said last named date, and being, or purporting
to be, a warranty deed from Anastacio Camargo to Rosa Guer-
rade Camargo for certain real estate in the city of San Antonio,
Bexar county, Texas, said filed papers purporting to have been
acknowledged before Julius Hoyer, a notary public for said
Bexar county, in the month of October, A. D. 1871, and a more
definite description of which said filed papers as aforesaid is to
these grand jurors unknown, can not be ascertained, and can not
be given, without the consent of Thad. W. Smith, the county
clerk of said Bexar county, Texas, and then and there the law-
ful custodian and keeper of said filed paper as aforesaid, and

with the fraudulent and felonious intent to destroy, suppress and conceal said filed paper as aforesaid, and to prevent the lawful use of the same, contrary," etc.

The opinion sets out the substance of the testimony of the State's witnesses, Thad. W. Smith, Adolph Vidal and J. L. Morin.

Juan Bererra testified, for the State, that he was deputy county clerk of Bexar county in June, 1885. The witness saw a deed which Mr. Smith received through the mail, together with a note requesting that the deed be recorded and sent to a man named Mateo, in Monterey, Mexico. The witness examined the certificate of acknowledgment to the deed, but did not critically examine the body of the deed. This was on the third day of June, 1885. Witness saw the defendant in the county clerk's office on that day. Mr. Smith exhibited the deed to the defendant, and defendant made some remark about it which the witness could not recall. The witness saw the defendant on the next day, before nine o'clock. On his way to the office he met the defendant, near Garza's place. Defendant, apparently much excited, said to witness: "I want you to give me that paper!" Witness asked: "What paper?" Defendant replied: "You know what paper." The witness replied: "I do not know what paper you mean, but I will give you any paper which I can honorably give you. I can give you no paper until you tell me which paper you mean." Defendant said: "Never mind; I will get it any way." Witness saw the defendant later when he came in to the office with Mr. Smith, but did not hear the conversation which passed between Smith and defendant. The witness saw the note accompanying the deed when it was received at the office. He did not know the handwriting. Witness had lived in San Antonio fifty-four years. He knew the witness Adolph Vidal, and knew his father, Adolph Vidal, who lived at the time of this trial on the Chupederas creek. Witness had never seen the deed since June 3, 1885. He had never talked with defendant about it since the occasion mentioned. Defendant said nothing about a certified copy of the deed.

C. K. Breneman testified, for the State, that he never had a conversation with defendant about a deed from Anastacio Camargo to his wife, Rosa. He did not request the defendant to go to the county-clerk's office, get such a deed and bring it to him for inspection.

Oscar Bergstrom, of the law firm of Breneman & Bergstrom,

testified, for the State, that he had no conversation with the defendant on either the third or fourth of June, 1885, though he did have a conversation with him in September about a proposed compromise of the dispute over the land between him and Morin. Morin said that he would compromise if the defendant would pay him a certain sum of money at once, but that if he had to wait until the grand jury indicted defendant for abstracting the deed, defendant would have to pay him much more. Defendant declined the terms of compromise offered him, and said that the grand jury, if it wanted to, could go ahead and indict him; that he lost the deed and did not know what became of it.

Cross-examined, the witness said that a short time after the suit of the Piedras heirs was filed against defendant, the defendant retained him to file an answer to prevent default, and in the course of the conversation said that he was expecting to receive a paper that would perfect his title to the land. He did not say from where he was expecting the paper. Witness offered Morin one hundred dollars in compromise for the land, which he thought was about the value of the half interest claimed for the heirs. Morin refused the offer, demanded a thousand, and said that he would not take a thousand after the grand jury indicted the defendant for stealing or forging the deed. Witness reported to defendant, and defendant said: "If he wants to indict me, let him go ahead; I will pay no more."

Narciso Leal testified, for the State, that he first heard of this case about ten days before this trial. Witness knew that the land which figures in this case was sold by his brother Guadalupe to the defendant. Witness heard, when his brother bought the land, that supposed heirs would eventually attack the title. The witness knew Anastacio Camargo in his life time. He died in 1872 or 1873. Witness also knew his wife Rosa, who afterwards married Molino, but did not know whether or not she was still living. Camargo was not living when his wife sold the land to the witness's brother. The witness had never seen a deed or will conveying the land in question to Mrs. Rosa Camargo.

Captain Philip Shardien, city marshal of San Antonio, testified for the State, that the defendant came to him some months before this trial and spoke to him about some paper he had lost, which he said was of no value to any one. He asked witness to look out for it. As defendant said the paper was of no value, witness paid no attention to his request.

---

---

The motion for new trial raised the question discussed in the opinion.

*Waelder & Upson* filed an able brief and argument for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State:

HURT, JUDGE. This is a conviction for the theft of a filed paper, a deed. It appears from the record that one Anastacio Camargo once owned a certain lot or parcel of land in the city of San Antonio; that his wife, Rosa Camargo, sold this lot to one Leal, and that Leal sold to Witte, the defendant; that Anastacio Camargo had adopted children, and that they were suing Witte for one half interest in the lot of land; that there was no transfer from Anastacio Camargo to his wife, Rosa, known to Witte, before the third day of June, 1885; that on that date the county clerk of Bexar county, Mr. Thad. Smith, received a letter purporting to be from Adolph Vidal, from the city of San Antonio, containing a deed from Anastacio Camargo to his wife, Rosa. The letter reads as follows:

"SAN ANTONIO, June 2, 1885.
" *Thad. W. Smith:*
"MY DEAR SIR:—This was handed to me by Senor Mateo, with two dollars. On account of pressure of time I send it to you by mail. Please record and return at once to Senor C. C. Mateo, Monterey, Mexico.
"Yours truly,       ADOLPH VIDAL."

Smith neither knew Mateo, nor the handwriting of the letter, or that on the envelope.

This deed seemed to have been copied from a form. The body of the deed and the form for acknowledgment were in the same handwriting. The signature of the grantor and that of the notary were in different handwriting. The deed was dated October 10, 1881.

Within about half an hour after Smith received the letter containing the deed, Witte came into his office. Smith hailed him, and said: "Come in here; here is something you have been looking for for several years." Smith then showed him the deed and he proceeded to examine it. Bererra, Smith and Witte were

present. Witte seemed surprised. Smith showed him the letter also. The deed was examined by Bererra, Smith and Witte. It seemed to be too new for its date. Smith compared the acknowledgment of the deed with the notarial docket and protest book, of Julius Hoyer, before whom the deed purported to be acknowledged, and compared them with the signature and seal. The signature appeared as near exact as could be. Hoyer had a peculiar signature. The seal differed. Witte said he expected something of the kind, "but thought it was a will;" that he had been told by Rosenheimer and others that there was a will. Smith had been told there was a will, and was surprised as well as Witte when he saw the deed.

The acknowldgement was in proper form. Smith told Witte that it looked suspicious. Witte said it looked peculiar. Witte then left. The seal on the deed differed from Hoyer's seal, in that it had the word "Texas" around the margin of the seal instead of around the points of the star. There were two kinds of seals used at the time. Smith examined one of Hoyer's of same date as that of the deed, and it differed from the one used on the deed. Smith showed defendant the letter that accompanied the deed. He said he had been looking for some evidence from Mexico to show that Anastacio Camargo had made a will in favor of his wife.

In the afternoon Witte came back and said he did not know C. C. Mateo. Smith was born in San Antonio, and was twenty-eight years of age, and did not know any other Adolph Vidal than the one here as a witness. Smith told Witte that he would record the deed and send it to Mateo, in Monterey, Mexico. The next morning, when Smith was coming to the office, he met Witte at the Presbyterian church, on Houston street. Witte said to him that he would like to get the deed; that he wanted it to show to his attorneys, Breneman & Bergstrom, or that they wanted to see it (Smith does not remember which). Witte said: "I have a case in justice Neuendorf's court at nine o'clock this morning. My attorneys are in the case, and that he had to go to South Flores street to see a witness in this case, and would leave the deed with Breneman & Bergstrom, and bring to you when he came back." When Smith reached his office, his deputy was about to record the deed, and he, Smith, asked Witte to wait an hour and the deed would be recorded. He said no; he would like to take it with him, as he did not know when his attorneys would get through with the case; that he would bring the deed

back within half an hour. Smith told him that if he would bring it back within half an hour he could take it, and handed him the deed. Witte left and returned in half an hour, very much excited, and said: "You may kill me or do what you please with me, but I have lost that deed, and I must have dropped it at Chavez's house when I pulled out papers to show witness, or I lost it in the car. What must I do about it?" Smith told him to go and see Captain Shardein, and to tell Colonel Belknap to instruct the street car drivers to be on the look out for it. Witte said he would do so. He spoke of advertising in the papers. He went away, saying he would see Shardien and Hughes. Witte told Smith afterwards that he had spoken to Shardein and Hughes several times, and that he had made thorough search. Neither Bergstrom nor Breneman had spoken to defendant about the deed.

Mr. Adolph Vidal, spoken of by Smith, was a witness, and swears that "he was born in San Antonio; that he knew no one in this State named Adolph Vidal but himself, and that he never saw the letter before;" *i. e.*, the letter shown to him, the letter which was sent to Smith and contained the deed. "There might be other Adolph Vidals in the State, or in Mexico."

Joe L. Morin testified "that he was representing the suit of the heirs against Witte for the one-half interest of the lot of land; that he had known defendant for three years." This witness says that "I had several interviews with defendant in reference to the deed from Anastacio Camargo to his wife after the suit against Witte was filed. Every time he met me he spoke of a compromise. On one particular occasion, some time in May last, I spoke to Witte and said: "I understand you want to compromise." He said: "Yes, but I have found and have in my possession a deed from Anastacio Camargo to his wife, which of course revokes the adoption and throws you out entirely; therefore, you have no right to the land, and hereafter I want nothing more to do with you about this affair. If you don't want to believe it, go to the records and you will find it there." Witness Morin went to the clerk's office and searched through the records but found nothing; he spoke to the clerk about it. Morin saw defendant in September, 1885. Witte said to him: "The matter is so small I have concluded to compromise; meet me at Breneman & Bergstrom's office and I will settle with you. But don't tell any one of the conversation we

have had before of this matter." The parties met at the office, but failed to settle the matter or compromise.

We have been thus particular in giving the important facts in this case, for the purpose of developing the only theory upon which the State, as we think, can legally rely for a conviction. Before stating this theory let us examine the law under which this prosecution is had. It is found in Article 741, Penal Code. It provides that if any person shall take and carry away *file papers* from any clerk's office with intent to destroy, suppress, alter or conceal; or in any wise dispose of the same, so as to prevent the lawful use of such file paper, he shall be deemed guilty of theft, and punished by imprisonment in the penitentiary not less than three nor more than seven years.

It will be seen from this statute that the taking and conveying away of the paper must be with a double intent : First. To destroy, suppress, alter, conceal or in any wise dispose of such paper. Now ordinarily the lawful use of the paper, with the ultimate intent to prevent the lawful use of the paper in this case, it being a deed to land, would be to prove that the title to the lot, or parcel of land therein described, had passed from the grantor, Anastacio Camargo, to his wife, Rosa. This being the case, and as the record fails to show that any other person save the defendant was interested in preserving the deed, it certainly was not his intention to prevent this use being made of the deed, for it inured to his benefit alone. It was the missing link in the chain of title, and with this deed he would, so far as this record shows, have defeated the suit of the heirs of Camargo, who were then suing him for the lot of land mentioned in the deed.

But is this the only *lawful* use to which the paper (the deed) could be applied in the meaning of the statute ? We think not, for the language of the statute is quite comprehensive—*any lawful use*. Believing, therefore, that the prosecution was not confined to the ordinary use of such a paper, the following theory must have been adopted, to-wit: that Witte himself, or by another, had forged the deed, and fearing detection, stole the deed, and destroyed it, with intent to prevent its being used in a prosecution against him for the forgery; that the deed contained upon its face evidence of being forged, or at least would be made the basis of a charge of forgery, and that by its destruction, or for the want of it in a prosecution for the forgery, the State would fail to establish his guilt, or at least the proof of guilt would be rendered much more difficult.

As above stated, this being the only theory upon which, under the facts of this case, a conviction could possibly be had, two questions present themselves. First. Was it not necessary for the indictment to allege the lawful use of the deed which defendant intended to prevent by its destruction? As a deed can be lawfully used in a variety of ways, and for a great many purposes besides as evidence of title, or that title passed from one person to another, we think the indictment should set forth the lawful use sought to be prevented by the defendant. If this proposition is not correct, then we are clearly of the opinion that the State should be confined to the ordinary use to which a deed to land is put, to-wit, to prove title to land therein conveyed.

Second. Conceding that the statute is broad enough to embrace the use of a deed to prove its forgery, was this issue submitted to the jury by the charge of the court? Were they, in substance, told that if they believed beyond a reasonable doubt that if defendant took and carried away the deed, and destroyed it for the purpose of preventing its use in evidence in a case of an apprehended prosecution for its forgery, they should find him guilty? Not so. In fact, this appellant has been convicted upon a theory not presented in the charge of the court; and the only theory, if alleged and properly presented by the charge, upon which, under the facts of this case, he could possibly be legally convicted. How do we know that the jury would have convicted appellant if they had been informed what should be proven in order to convict.

We believe that, under the peculiar facts of this case, the indictment should have alleged the particular use of the deed which was intended to be prevented by its destruction by defendant; or that the State should have been confined to the proof that defendant intended to prevent its ordinary use, to-wit: that of being used for the purpose of proving title to the land therein conveyed. This being the usual and ordinary use made of deeds to land, the defendant had the right to presume from the allegation in the indictment "that he intended to prevent its lawful use," that this was what was meant by said allegation,—and if the prosecution intended to rely upon the fact that appellant intended to prevent any other lawful use of said deed, the indictment should have alleged the facts,—set forth the particular use of the deed which defendant by destroying the deed intended to prevent; otherwise, defendant would not be informed in plain language of the nature of the accusation against him, but would

be deceived, because he would naturally infer from the allegation "to prevent its lawful use" that he was charged with intending to prevent the deed being used as evidence of title to land and nothing more.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*